# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

PENNSYLVANIA LUMBERMENS
 MUTUAL INSURANCE COMPANY,

      Plaintiff,

    v.

3333, LLC,

      Defendant.

No. 23 CV 14271

Magistrate Judge McShain

## MEMORANDUM OPINION AND ORDER

Pending before the Court are the parties' cross-motions for summary judgment. [68, 70].[1] For the following reasons, plaintiff's motion is denied and defendant's motion is granted in part and denied in part.[2]

## Background

This is an insurance dispute arising from plaintiff Pennsylvania Lumbermens Mutual Insurance Company's (PLM) refusal to cover a loss allegedly sustained by its insured, defendant 3333, LLC (3333), in June 2022.

### A.    Obtaining the Policy

3333 is a family-run limited liability company that owns a warehouse located at 3333 West 47th Place in Chicago. [73] 1 at ¶ 3; [74] 3 at ¶¶ 8, 12. David Radzieta is 3333's manager and the "point of contact" for "anything that pertains to the building," including insurance, maintenance, and general upkeep. [74-3] 8, at 7:1-7. Radzieta, who had a high school diploma but did not complete college, owns a second business, Great Lakes Lumber & Pallet, which operated out of 3333's warehouse, and is the manager of a third business, Pallet Cartage Services, LLC. [73-5] 4, at 9:16-21; [id.] 9, at 27:8-12; [74-3] 8, at 7:15-17; [74-4] 2-3. Before the claim at issue in this case, Radzieta had never made an insurance claim on behalf of 3333. Radzieta had made

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings.

[2] The parties have consented to the exercise of jurisdiction by a United States Magistrate Judge. [19]. The Court has subject-matter jurisdiction over this case based on diversity of citizenship, *see* [47] 2 at ¶¶ 1-6, and the parties agree that Illinois substantive law governs their claims.

two auto insurance claims and had some experience dealing with workman's compensation claims. [73-5] 5, at 12:3-13:24.

To obtain insurance for 3333's warehouse, Radzieta acted through an insurance broker, Southpoint Insurance Agency, Inc., with whom he had a relationship since 2020. [73-5] 6, at 15:12-16:5. [74-3] 20, at 19:20-23; [74] 4, at ¶ 16. In October 2021, PLM issued 3333 a commercial property insurance policy that was effective from October 29, 2021, through October 29, 2022, and included a $2.5 million coverage limit. [74-1]. Radzieta admitted that he read the policy and was as "familiar with the conditions of the policy" "[a]s much as a layman can be." [74-3] 26, at 26:15-20.

## B.    The Alleged Loss

Testifying as 3333's Rule 30(b)(6) designee, Radzieta stated that he first noticed water pooling inside the warehouse "around August" 2022. [74-3] 33, at 32:21-22. The water was on the floor, and Radzieta assumed it had entered the building through the southeastern portion of the roof. [*Id.*] 34, at 33:1-11. Prior to this, Radzieta had never seen water on the floor of the building. [*Id.*], at 33:12-18. In response to one of PLM's interrogatories, however, 3333 stated that it "first began noticing water pooling in late June 2022." [74-9] 2. It is unclear from the interrogatory response who observed the water or where the pooling was observed.

Radzieta's first step after noticing the water was to have Bogdan Lassak Construction, his handyman contact, inspect the roof. [74-3] 34-35, at 33:24-34:2. Bogdan Lassak inspected the roof and told Radzieta that the damage he observed could be due to "a weather event." [*Id.*], at 34:3. Radzieta then had a roofing company, Conrad Roofing, inspect the roof in August or September 2022. [74] 5 at ¶¶ 27-28. Conrad found damage to the roof membrane that could have been caused by wind from a weather event. [74-3] 35-36, at 34:5-35:12. One of Conrad's principals, Boguslaw Bosak, testified that the roof was in the condition of a 20-year-old roof, and that the roof's life expectancy was 25 to 30 years. [81] 12 at ¶¶ 15-16.

In "late summer/fall," Radzieta contacted public adjuster Jonathan Tishel, of T&T Public Adjusters, because he wanted a "professional opinion" to help him "navigate" the situation. [74-3] 36, at 35:18-21; [*id.*] 39, at 38:20-21. Radzieta also hired Tishel's general contracting company, JSMM, Inc., to "resolve his roof issues and to be the general contractor on this project." [74-7] 10, at 9:1-10. Tishel inspected the roof in August or September and concluded that it had been damaged during a weather event and that there was moisture between the roof membrane and the roof itself. [*Id.*] 40, at 39:17-21. Tishel based these conclusions in part on Radzieta's statement that he believed that a storm in late June 2022 had damaged the roof. [74] at ¶¶ 50-51. Tishel instructed Bogdan Lassak to place protective tarps on portions of the roof, and Lassak confirmed that, in August or September, tarps were placed on

2

several damaged portions of the roof. [*Id.*] 55, at 54:12-23; [74-13] 49, at 48:1-22. At that time, Radzieta testified, the warehouse was "still experiencing water pooling." [73-5] 31, at 117:10-14.

As Radzieta investigated the water incursion, 3333 came to believe that the water intrusion was the result of a weather event that had occurred on June 13, 2022. *See* [74] 5, at ¶ 25. It is undisputed that a significant storm, with high windspeeds and hail up to 0.75 inches in diameter, hit the Chicagoland area that day. [74-12] 3; [74-25] 5-7. In fixing the date of the loss, Tishel relied on a forensic storm report and his own inspection of the roof. [74-21] 23-24, at 22:21-23:2. Tishel also relied on Radzieta's statement that he saw corrugated panels in the street next to the warehouse in June or the beginning of summer. [74-21] 25, at 24:14-19; [*id.*] 33, at 32:5-9. Tishel acknowledged that other significant wind events had occurred in the Chicagoland area both before and after the June 2022 storm and that it was possible that one of those storms could have damaged the roof. [*Id.*] 37-39, at 36:24-38:

3333 reported the loss to PLM on February 28, 2023, and made a claim for $2,072,901.09 in damages caused by the June 13, 2022, storm. [74-18] 3; [74-19] 10, at 9:8-12; *see also* [73-11] 2. Radzieta and Tishel did not report the loss sooner because they were waiting on an engineering report to confirm whether there was moisture between the roof membrane and the wooden underlay. [74-3] 41, at 40:6-16. The firm that Tishel hired to prepare this report, the Roofing Engineers, did not inspect the roof until July 2023, more than four months after the claim was made. [74] 7 at ¶ 48. Based on a moisture-mapping inspection, the Roofing Engineers concluded that moisture was present "between the roof and the EPDM membrane on the roof" at the time of this inspection. [*Id.*] at ¶ 43.

### C.    PLM's Investigation

On March 1, 2023, PLM acknowledged the claim and issued a reservation-of-rights letter. [73-7]. PLM identified "a couple of coverage issues which are of concern," including the fact that "[t]he claim was reported almost 260 days after the loss occurred." [*Id.*] 4. PLM advised 3333 that it would "continue to handle this claim even though a coverage question exists" but it was reserving its "right to deny coverage," including for "other reasons" not mentioned in the letter. [*Id.*].

PLM retained EFI Global to inspect 3333's warehouse, and EFI inspected the roof on April 18, 2023. [74] 8 at ¶ 60; *see also* [74-25] (EFI report dated May 9, 2023).[3] EFI concluded that 20 to 40 punctures on the roof membrane could have been caused

---

[3] 3333 argues that EFI's report is inadmissible because PLM disclosed the author of the report, Carl Schoenberger, only as a rebuttal expert, but this report does not rebut any of the opinions of 3333's experts. *See* [78] 2; *see also* [73-13] 2-3 (PLM's rebuttal expert witness disclosures). The Court addresses this issue below but summarizes the report here to provide background information about PLM's handling of the claim.

by wind-borne debris impacts. [*Id.*] 9 at ¶ 62. EFI observed loose sections of membrane at the roof's parapets, but it concluded that those were attributable to improper installation and general deterioration of the roof. [*Id.*]. EFI also observed indentations on some metal components of the roof that were consistent with hail strikes, but EFI determined that there was no loss of function to those components. [*Id.*] at ¶ 64. EFI concluded that these indentations likely occurred "over the life of these components and not from one recent event." [*Id.*]. Finally, EFI observed "multiple areas of dark stains and discoloration to the roof deck" inside the building that "can be attributed to long term water infiltration." [*Id.*] at ¶ 65.

PLM also retained Sedgwick Building Consultants to assist with the claims process. [74] 9 at ¶ 67. Based on its April 2023 inspection of the roof, Sedgwick recommended that PLM pay $8,042.46 to resolve 3333's claim. [*Id.*] 10 at ¶ 69. In July 2023, PLM paid that amount to 3333. [73] 5 at ¶ 16; *see also* [47] 9 at ¶ 38. A PLM claims manager, Nina Manojilovich, testified that if PLM had made a payment to an insured, that "would mean that we paid what we think what was caused by covered – damage that was caused by covered cause of loss." [73-9] 5, at 12:17-23.

### D.   Litigation

On September 7, 2023, 3333 invoked the insurance policy's appraisal clause and demanded that PLM appraise the damaged portions of the building. [74] 10 at ¶ 71. Three weeks later, PLM issued a denial-of-coverage letter and declined to participate in an appraisal. [73-11]. PLM explained that it was denying coverage because 3333 failed to give prompt notice of the loss, mitigate its damages, and comply with the policy's coinsurance requirement. [*Id.*] 2. PLM also asserted that no loss had occurred during the policy period and that 3333's claim improperly sought non-recoverable depreciation. [*Id.*] 2-3. Regarding the appraisal, PLM contended that, given "the disparity between [3333's] damage estimate of $2,072,901.09 and PLM's estimate of $8,042.46," an appraisal would be futile. [*Id.*] 3.

PLM filed this lawsuit on September 28, 2023, seeking a declaratory judgment that it is not obligated to cover the claimed loss. *See* [47] at ¶¶ 40-91. Relevant to the pending motions, PLM's second amended complaint alleges that the loss occurred before the policy period began (Count I); 3333 gave late notice of the alleged loss, which prejudiced PLM's ability to investigate the claim (Count II); 3333 failed to mitigate damage to the roof (Count III); the policy excludes coverage because the loss is attributable to (a) continuous or repeated seepage or leakage of water that occurred over a period of 14 days or longer and (b) 3333's neglect to use all reasonable means to save and preserve the property from further damage (Count IV); and 3333 failed to cooperate with PLM's investigation of the claim (Count V). 3333 filed a counterclaim in February 2024, alleging as relevant here that PLM must cover the loss (Count I); PLM's handling of the claim was unreasonable and vexatious, in

4

violation of Section 155 of the Illinois Insurance Code (Count III); and PLM breached the insurance policy by refusing to pay for the damage to the roof (Count IV). *See* [26].

## Legal Standard

A party is entitled to summary judgment if it demonstrates that "there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute about a material fact exists "if the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law." *Villalobos v. Calumet City Police Officers Louis Piciccio*, 765 F. Supp. 3d 741, 749 (N.D. Ill. 2025). "If this burden is met, the adverse party must then set forth specific facts showing that there is a genuine issue for trial." *Id.* (internal quotation marks omitted). "In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the nonmoving party." *Id.*

"Cross-motions for summary judgment do not alter the standard for summary judgment. The Court must still construe all facts and inferences arising from them in favor of the party against whom the motion under consideration is made." *Villalobos*, 765 F. Supp. 3d at 749 (internal quotation marks omitted).

## Discussion

## I.    Timely Notice of Loss

Both sides seek summary judgment on Count II of PLM's second amended complaint, which alleges that 3333 failed to give timely notice of the loss. [69] 2, 3-10; [71] 6-11. The policy required 3333 to give PLM "prompt notice of the loss" and to provide a description of the loss "[a]s soon as possible[.]" [74] 2 at ¶ 5. PLM contends that it is entitled to summary judgment because 3333's notice, submitted on February 28, 2023–more than eight months after the June 2022 storm that allegedly caused the loss–was untimely as a matter of law. 3333 contends that its notice was timely as a matter of law. The Court concludes that, while the material facts are undisputed, reasonable jurors could draw different conclusions from those facts as to whether 3333's notice was timely. Accordingly, neither side is entitled to summary judgment on Count II.

### A.    Legal Standard

"The purpose of an insurance policy's notice provision is to ensure that the insurer will be able to timely investigate" claims arising under the policy. *Berglind v. Paintball Bus. Ass'n*, 930 N.E.2d 1036, 1044 (Ill. App. Ct. 2010). When, as in this case,

the policy "does not identify a specific time frame for giving notice," courts will interpret the policy as requiring that notice be given within a "reasonable time." *W. Am. Ins. Co. v. Yorkville Nat'l Bank*, 939 N.E.2d 288, 294 (Ill. 2010); *see also Westport Ins. Corp. v. Sycamore Cmty. Unit Sch. Dist. #427*, 555 F. Supp. 3d 550, 559 (N.D. Ill. 2021) ("In resolving disputes over notice provisions, Illinois courts have read such provisions as requirements that the insured provide notice within a reasonable time.") (internal quotation marks omitted). "Breaching a policy's notice clause by failing to give reasonable notice will defeat the right of the insured party to recover under the policy." *Country Mut. Ins. Co. v. Livorsi Marine, Inc.*, 856 N.E.2d 338, 343 (Ill. 2006).

"Whether notice has been given within a reasonable time depends on the facts and circumstances of each case." *Livorsi*, 856 N.E.2d at 343. "The following factors may be considered in determining whether notice to an insurer has been given within a reasonable time: (1) the specific language of the policy's notice provision; (2) the insured's sophistication in commerce and insurance matters; (3) the insured's awareness of an event that may trigger insurance coverage; (4) the insured's diligence in ascertaining whether policy coverage is available; and (5) prejudice to the insurer." *Yorkville*, 939 N.E.2d at 293-94.

"The timeliness of an insured's notice to its insurer generally is a question for the trier of fact." *Yorkville*, 939 N.E.2d at 293. But "[i]f no material facts are in dispute, whether [an insured] satisfied a notice provision is a question of law that may be resolved on summary judgment." *Towne Plaza Condo. Ass'n v. Philadelphia Indem. Ins. Co.*, 17 C 1561, 2019 WL 3287837, at *4 (N.D. Ill. July 22, 2019); *see also Berglind*, 930 N.E.2d at 1044 (same).

## B.    Analysis

### 1.    Policy Language

The parties' policy does not identify a specific timeframe in which notice must be given; it required only that 3333 give "prompt notice of the loss" and describe "as soon as possible" how, where, and when the loss occurred. [74] 2, at ¶ 5. This factor thus "does little to aid in the reasonableness analysis because it does not identify a specific time frame for giving notice." *Westport*, 555 F. Supp. 3d at 559 (internal quotation marks and brackets omitted).

### 2.    Sophistication

The evidence supports conflicting inferences as to how sophisticated 3333 and its principal, David Radzieta, were in commercial and insurance matters.

6

Radzieta had a high school diploma, but he completed only a few college courses and never graduated. PLM emphasizes that Radzieta owned two businesses, but its briefing does not make clear the nature of the business that these entities conducted, what specific tasks Radzieta performed for them, or whether Radzieta or his businesses were particularly successful. Furthermore, Radzieta had limited experience in insurance matters–and essentially no meaningful experience with complex commercial general liability policies like the one at issue here. *See State Auto Prop. & Cas. Ins. Co. v. Brumit Servs., Inc.*, 877 F.3d 355, 360 (7th Cir. 2017) (applying Illinois law and recognizing that commercial general liability policies are relatively difficult to understand). Radzieta had never made a claim on 3333's behalf, and his experience dealing with auto insurance claims does not readily translate to sophistication in the context of a commercial general liability policy. *See id.* (observing that "it doesn't take much expertise to interpret a basic automobile insurance policy"). Likewise, the fact that Radzieta was responsible for purchasing 3333's policy does not mean that he was particularly sophisticated. *See Berglind*, 930 N.E.2d at 1046 (holding that insured whose "only experience . . . with insurance is merely purchasing the CGL policy for the paintball facility from an insurance agent" was not sophisticated). All these considerations would permit a rational jury finding that neither 3333 nor Radzieta was particularly sophisticated in insurance matters.

At the same time, Radzieta hired an experienced public adjuster, Jonathan Tishel, to assist him assess the damage to the roof and make a claim to PLM. "The expertise of an insured's third-party advisor[ ]" like Tishel "bolsters the insured's sophistication." *Towne Place*, 2019 WL 3287837, at *6. Moreover, while a factfinder might agree that a commercial general liability insurance policy is a complex legal document, Radzieta never denied that he understood, at least in a general sense, that he had to notify PLM of the alleged loss. This evidence would permit a reasonable jury to find that 3333 and Radzieta, aided by Tishel, were sufficiently sophisticated to understand the general obligation to notify PLM of an alleged loss.

Because reasonable jurors could weigh this evidence differently, this factor weighs against summary judgment for either side.

### 3. Awareness of an Occurrence

"An insured is not required to report [to its insurer] every injury it is aware of, it is only required to report those injuries which a reasonable person would understand is likely to lead to a claim." *Am. Country Ins. Co. v. Efficient Constr. Corp.*, 587 N.E.2d 1073, 1076 (Ill. App. Ct. 1992).

Here, the evidence is undisputed that Radzieta and 3333 knew in August 2022 that water was intruding into the warehouse. The evidence is also undisputed that, after Radzieta discovered the water intrusion, he engaged a handyman to inspect the roof and learned that a weather event had possibly damaged the roof, hired a roofing

company to inspect the roof and learned from the roofer that the roof's membrane had been damaged, hired a public adjuster to help him navigate the situation, and knew that Tishel had instructed Bogdan Lassak to place tarps on certain portions of the roof. All this evidence permits a jury finding that, no later than September 2022, Radzieta and 3333 were reasonably sure that a storm had damaged the warehouse's roof and that water was intruding into the building as a result. This factor weighs against the reasonableness of 3333's notice and in favor of PLM's motion for summary judgment.

### 4. Diligence

"[A] lengthy delay in providing notice is not an absolute bar to coverage provided the insured's reason for the delay is justifiable under the circumstances." *Yorkville*, 939 N.E.2d at 294. The Court concludes that reasonable factfinders could draw different conclusions from the evidence as to whether 3333 acted with reasonable diligence once it became aware of a possible claim.

First, while PLM emphasizes that eight months elapsed between the June 2022 storm that allegedly caused the loss and 3333's submission of the claim in February 2023, there is essentially no evidence in the record suggesting that 3333 should have known about the loss immediately after it occurred. Radzieta testified that he did not notice water intruding into the building until August 2022, and 3333's efforts to investigate and determine the source of the damage did not begin until August and September 2022. Thus, viewing the evidence in the light most favorable to 3333–as the Court must do in considering PLM's motion, *see Villalobos*, 765 F. Supp. 3d at 749–the relevant timeframe is shortened to a five- or six-month period. While one of 3333's interrogatory responses stated that water was observed pooling in June 2022, a reasonable jury could find that this response is vague because it does not establish who observed water pooling or where in the building it was seen. Indeed, PLM does not even rely on this evidence in arguing that 3333 was not diligent, *see* [69] 8 (focusing on events in August and September 2022), nor does PLM cite any deposition testimony where Radzieta was asked about the apparent discrepancy between the interrogatory response and his claim that he first noticed water in the building in August 2022.

Second, a rational jury could find that 3333 acted with reasonable diligence in investigating the damage before making a claim to PLM. 3333 undertook a multi-step investigation into the water intrusion. Radzieta initially enlisted a handyman to inspect the roof. After Bogdan Lassak observed damage to the roof and suggested that it could have been caused by a weather event, Radzieta hired Conrad Roofing to conduct another inspection of the roof. Apparently recognizing the seriousness of the situation, Radzieta then turned to Tishel, an experienced public adjuster, to help him address the damage. Modest remediation efforts began when Lassak, at Tishel's direction, placed tarps on several damaged areas on the roof. Tishel then retained an

8

engineering firm to assess whether water had penetrated the roof's membrane. Although several months passed before the Roofing Engineers inspected the roof, Radzieta testified that "it was quite challenging to find reputable people to show up in a timely manner" and that "[t]here was a lot of backlog in the industry" due to the ongoing COVID-19 pandemic. [73-5] 11, at 37:11-16. Given this evidence, a jury could find that 3333 was reasonably diligent in investigating the damage before making a claim.

Third, the evidence viewed in the light most favorable to PLM supports a finding that 3333 was not reasonably diligent. 3333 largely completed its investigation into the roof damage and water intrusion no later than September 2022. Yet 3333 waited an additional five months before notifying PLM of the loss. Importantly, 3333 appears to have taken little or no action during that time to investigate the damage or to substantiate its claim (other than hiring the Roofing Engineers and waiting on their report). While 3333 attributes its delay to COVID-19-related difficulties in finding reliable help, a reasonable juror could easily discredit that claim: 3333 has not offered any specific evidence of the efforts it made to contact roofers, engineers, or other qualified professionals–let alone evidence that such workers could not or would not work for 3333 due to COVID-related issues. Accordingly, a reasonable jury could also weigh the diligence factor against the timeliness of 3333's notice.

### 5. Prejudice

"The presence or absence of prejudice to the insurer is one factor to consider when determining whether a policyholder has fulfilled any policy condition requiring reasonable notice." *Livorsi*, 856 N.E.2d at 346. At the same time, "once it is determined that the insurer did not receive reasonable notice of an occurrence . . . the policyholder may not recover under the policy, regardless of whether the lack of reasonable notice prejudiced the insurer." *Id.* "[A]n insurance company claiming prejudice due to untimely notice must show what it would have done differently if it had received timely notice." *Direct Auto Ins. Co. v. O'Neal*, 235 N.E.3d 692, 699 (Ill. App. Ct. 2022).

PLM argues that the Court need not consider whether it was prejudiced because the first four factors demonstrate that 3333 failed to give reasonable notice. *See* [69] 9 (arguing that "[p]rejudice to PLM is [i]rrelevant"); [87] 8. While that argument is based on *Livorsi*'s rule that the absence of prejudice cannot save an insured's claim if the insured failed to provide reasonable notice of a loss, here the Court cannot conclude as a matter of law that 3333 failed to give reasonably prompt notice. Thus, the presence or absence of prejudice is a relevant issue in this case.

The Court also concludes that a reasonable jury could reject PLM's claim that it was prejudiced by 3333's delayed notice. PLM contends that the delay prejudiced

it because more than ten months elapsed between the date of the alleged loss and the first time PLM inspected the warehouse. [69] 10. PLM submits that "eight significant storms occurred in the Chicago area between June 13, 2022, and February 28, 2023." [*Id.*]. Taken together, PLM's arguments suggest that its efforts to investigate the claim were necessarily hampered by the intervening weather events, which could have caused additional damage to the roof. PLM also emphasizes that prompt notice of a loss facilitates the inspection process, and that it is more difficult to assess damage seven or eight months after a loss. *See* [74] 8, at ¶¶ 55-58. But the Court concludes that a reasonable jury could reject these arguments and find that PLM was not prejudiced. To begin, while PLM points to the fact that there were multiple "significant storms" in the Chicagoland area between June 2022 and February 2023, PLM's evidence does not show that any of those storms had a combination of high wind speeds and hail (which the June 2022 storm had) that was likely to have caused damage to the warehouse's roof. *See* [74-12] 2-3. Furthermore, Radzieta testified that water was already intruding into the building by August 2022, and roof damage was observed in August and September by Bogdan Lassak and Conrad Roofing, so a reasonable factfinder could reject PLM's contention that a post-August 2022 storm caused the loss. Thus, even if the weather data on which PLM relies is admissible,[4] it does not strongly support PLM's prejudice argument.

Furthermore, EFI Global concluded that the damage to 3333's roof was caused, not by any specific weather event, but by the improper installation of the roof membrane and "general deterioration of the roofing materials" over time. *See* [74] 8 at ¶¶ 63-64. Given that conclusion, a reasonable juror could find that 3333's delay in notifying PLM of the loss did not prejudice PLM's ability to investigate the claim: any long-term deterioration and improper installation of the roof membrane would likely have been apparent whether the loss had been reported in or shortly after September 2022 or in February 2023.

---

[4] "In ruling on a motion for summary judgment, the court may consider any evidence that would be admissible at trial." *Sterk v. Path, Inc.*, 46 F. Supp. 3d 813, 816 (N.D. Ill. 2014) (internal quotation marks omitted). PLM relies on a nine-page printout from the National Weather Service's website that lists "All Local Events" that occurred in northern Illinois and northwest Indiana between May 1855 and August 2023. *See* [74-12]. 3333 argues that the NWS storm data is inadmissible because it is not certified, but it cites no authority to support its argument and it even acknowledges that, had the data been certified, it would likely be admissible under Federal Rule of Evidence 902(5) as a self-authenticating document. *See* [78] 2. PLM's response cites only Illinois authority, *see* [87] 3, which is irrelevant. The admissibility of the weather data in this case turns on the Federal Rules of Evidence, and the cases cited by PLM are also distinguishable because they involved certified weather reports, *see Trimble v. Olympic Tavern, Inc.*, 606 N.E.2d 1276, 1283 (Ill. App. Ct. 1993), or lay witnesses' personal observations of weather conditions, *see Maffett v. Bliss*, 771 N.E.2d 445, 454 (Ill. App. Ct. 2002). Because the parties have given this issue only cursory attention, and because PLM is not entitled to summary judgment even if the Court considers the NWS data, the Court assumes for purposes of this decision that the NWS data is admissible.

Finally, where there is some common-sense appeal to PLM's contention that it may be easier to inspect damaged property closer in time to the alleged loss, Tishel denied that delayed notice makes determining the cause of a loss more difficult. [84] 2 at ¶ 6. According to Tishel, it was "simple to understand" based on what he observed, including "the corrugated panels," that "the rips in [ ] some of the panels . . . were fresh." [*Id.*]. Tishel also testified that "you can go out right after the storm . . . and you can go out six months afterwards and it will still relatively not loom so much different from when you're walking on the roof to see what the difference in damage is." [80] 13 at ¶ 58. This evidence would further support a rational jury finding that PLM was not prejudiced by 3333's failure to more promptly notify it of the loss.

It was incumbent on PLM to establish "what it would have done differently if it had received timely notice" of the alleged loss from 3333. *Direct Auto*, 235 N.E.3d at 699. Because PLM has not done so, the Court concludes that a factual dispute exists as to whether PLM was prejudiced by 3333's delayed notice of the loss.

\*   \*   \*

Although the material facts are undisputed, the Court holds that reasonable jurors could reach different conclusions as to whether 3333 provided reasonably timely notice of the alleged loss. Indeed, while the awareness-of-occurrence largely favors PLM and the prejudice factor largely favors 3333, the remaining factors could be weighed in favor of either side. There is thus a material factual dispute as to the timeliness of 3333's notice,[5] and neither side is entitled to summary judgment on Count II of PLM's second amended complaint. *See Yapp v. Astellas Pharma Global Dev., Inc.*, No. 12-cv-1095, 2015 WL 1326371, at \*5 (N.D. Ill. Mar. 20, 2015) (denying summary judgment where undisputed facts "raise[d] conflicting inferences . . . that are properly weighed at trial, not at the summary judgment stage").

## II.   Exclusion Based on Continuous or Repeated Seepage or Leakage of Water

Each side contends that it is entitled to summary judgment on Count IV of the second amended complaint, which alleges that an exclusion for damage caused by continuous water seepage precludes coverage. [69] 13-14; [71] 12-13. This exclusion provides that PLM "will not pay for loss or damage caused directly or indirectly by . . . [c]ontinuous or repeated seepage or leakage of water, or the presence of condensation

---

[5] Each side has cited multiple cases to support its position that 3333's notice was timely or untimely as a matter of law. *See* [69] 4-5; [78] 3-5. The Court has reviewed these cases and has not found any case that would support a ruling that 3333's notice was timely or untimely as a matter of law. Rather, these cases demonstrate only that whether an insured provided timely notice of a loss or claim against it is a fact-intensive and case-specific question. *See Livorsi*, 856 N.E.2d at 343 ("Whether notice has been given within a reasonable time depends on the facts and circumstances of each case.").

of humidity, moisture or vapor, that occurs over a period of 14 days or more." [74] 2 at ¶ 6.

"In Illinois, it is the insurer's burden to affirmatively demonstrate the applicability of an exclusion." *Johnson Press of Am. v. Northern Ins. Co. of New York*, 791 N.E.2d 1291, 1298 (Ill. App. Ct. 2003). "Illinois courts will liberally construe any doubts as to coverage in favor of the insured, especially when the insurer seeks to avoid coverage based on an exclusion." *Id.*

PLM contends that the evidence is undisputed that water had repeatedly entered the warehouse over a lengthy period. [69] 13. It cites evidence reflecting that water was seen inside the warehouse on multiple occasions over more than a year: in June 2022, according to 3333's interrogatory response; in August 2022, when Radzieta noticed water pooling inside the warehouse; in September 2022, when Lassak Construction placed tarps on the roof; in July 2023, when the Roofing Engineers performed their inspection and observed water pooling in the building. [*Id.*] 13-14; [80] at ¶¶ 28-29, 38, 41, 44. PLM's motion also relies on the EFI Global report, in which an EFI engineer, Carl Schoenberger, concluded that the building had experienced "long term water infiltration," as evidenced by "multiple areas of dark stains and discoloration to the roof deck" that were observed "inside the building." [74] 9 at ¶ 65. 3333 responds that PLM is not entitled to summary judgment because Radzieta's testimony establishes that he never saw water inside the building before August 2022. [78] 12-13. 3333 also argues that this exclusion applies only if the continuous or repeated seepage of water caused the loss, but not if the result of a covered loss was continuous or repeated seepage of water into the building. [*Id.*] 13. Finally, 3333 argues that PLM cannot establish that the exclusion applies without expert testimony, but PLM's rebuttal experts' reports do not address the continuous-seepage exception. *See* [71] 12-13. PLM's reply does not directly address 3333's argument about the need for expert testimony to prove that this exclusion applies. *See* [87] 2-4. PLM instead sidesteps the issue and argues that the Court (and, presumably, a jury) can consider the "factual observations personally made by" Schoenberger and "recorded by [him] in the EFI Global [r]eport." [*Id.*] 3. This is so, PLM maintains, because Schoenberger was also disclosed as a fact witness in PLM's initial disclosures. *See* [87-1] 5.

### A.    PLM Is Not Entitled to Summary Judgment.

PLM is not entitled to summary judgment on its claim that the continuous-seepage exclusion applies. In reviewing PLM's motion, "the Court must accept the evidence of the nonmovant as true for purposes of summary judgment." *Ewing v. McDonough*, Case No. 19 C 649, 2024 WL 3028831, at *5 n.6 (N.D. Ill. June 17, 2024). Here, Radzieta testified that he never saw water inside the warehouse until August 2022. Bogdan Lassak, Conrad Roofing, and Tishel all observed damaged to the roof in August and September 2022. A reasonable jury could find from this evidence that

the June 2022 storm damaged the roof and permitted water to intrude into the roof membrane and into the building–and thus that the damage was not the result of continuous and repeated water seepage.

## B.     3333 Is Entitled to Summary Judgment.

However, 3333 is entitled to summary judgment because expert testimony is required to prove that the loss was caused by continuous or repeated water seepage, but PLM has not offered any admissible expert testimony on this issue. Under Illinois law, "[e]xpert testimony is required when the matters at issue are outside the common knowledge of laymen." *Rowsey v. Breitman*, 243 N.E.3d 996, 1012 (Ill. App. Ct. 2024) (internal quotation marks omitted); *see also Ruane v. Amore*, 677 N.E.2d 1369, 1377 (Ill. App. Ct. 1997) ("When the nature of the defect, and its existence, is beyond the jury's common understanding and experience, expert testimony is necessary to establish a defect."); *Madsen v. C.R. Bard, Inc.*, No. 20-CV-02345, 2022 WL 4483910, at *12 (N.D. Ill. Sept. 27, 2022) ("when the action involves specialized knowledge or expertise outside the layman's knowledge, Illinois law requires a plaintiff to present expert testimony to establish causation"). For the following reasons, the Court concludes that expert testimony is required to establish that the nature of the staining observed inside the 3333 warehouse was caused by repeated, long-term water intrusions and thus is not covered by the policy.

First, the Court finds that PLM forfeited any argument that expert testimony is not required to prove that the exclusion applies by failing to respond to 3333's argument on this point. 3333's motion for summary judgment squarely raised this issue, *see* [71] 12-13, but PLM did not address it, *see* [77] 14-15. Furthermore, after 3333 argued in its response to PLM's summary-judgment motion that the EFI Global report was inadmissible because PLM did not disclose Schoenberger as an expert, PLM did not contest that argument. Instead, it apparently chose not to contest the need for expert testimony and argued that Schoenberger's lay testimony sufficed to prove that the exclusion applied. *See* [87] 3-4, 9-10. All of this establishes that PLM had ample opportunity to contest the need for expert testimony but failed to do so. Thus, PLM has forfeited this issue. *See Stelzer v. State Farm Fire & Cas. Co.*, 666 F. Supp. 3d 852, 860 (E.D. Wis. 2023) (where, at summary-judgment stage, plaintiff "does not dispute State Farm's contention that under the facts of this case, expert testimony is necessary to support his breach of contract claim," plaintiff "waived any argument that expert testimony is not required to prove" that hail-producing storm with high winds caused extensive damage that necessitated complete roof replacement).

Second, and forfeiture aside, the Court holds that whether 3333's roof was damaged by continuous or repeated water intrusions over at least a 14-day period is an issue that is beyond an ordinary juror's common experience. Neither party has cited any relevant Illinois authority on this issue, and the Court's research did not

uncover a case in which a court applying Illinois law held that expert testimony was required to prove that long-term and repeated water intrusions had damaged a roof or building. Case law from other jurisdictions, however–including cases with very similar facts–generally holds that expert testimony is required for this kind of issue. *See, e.g.*, *Amaar Holding Inc. v. Travelers Cas. Ins. Co. of Am.*, 763 F. Supp. 3d 219, 232 (E.D.N.Y. 2025) ("The issue of whether the water flowed in through a storm-created opening or through existing openings to cause the water damage is beyond the ken of a layperson."); *Jackson v. State Farm Fire & Cas. Co.*, Civil No. 1:23-cv-HSO-BWR, 2024 WL 1183670, at *7 (S.D. Miss. Mar. 19, 2024) ("structural damage to homes, the long-term effects of moisture on a house, and other categories of property damage require expertise to accurately understand, and are therefore not properly the subject of lay opinion on causation"); *R&S Auto Sales v. Owners Ins. Co.*, 4:13-cv-479-RAW, T2015 WL 12434459, at *9 (S.D. Iowa Jan. 5, 2015) (expert testimony required to establish whether "deteriorated rubber washers or inserts are the cause of any leaks" in insured's roof).

Third, a review of the EFI Global report itself demonstrates that technical knowledge is required to understand why the water-seepage exclusion applies. The author of the EFI report, Carl Schoenberger, opined that, based on the specific characteristics of the water stains he observed throughout 3333's warehouse, the water damage was a minimum of six- to eight-months-old. *See* [74-25] 9-10. The substance of the report makes clear that Shoenberger relied, not on everyday knowledge likely to be possessed by most jurors, but on highly specialized knowledge about the relationship between water intrusions and wood staining. According to Schoenberger, there was "widespread dark staining and discoloration to the roof deck and associated framing" inside 3333's warehouse. [*Id*] 9. Schoenberger deduced from these stains–and in particular the presence of "[m]ultiple concentric rings of discoloration, with darker staining"–that water had intruded into the building repeatedly or over a long period of time:

> There was widespread dark staining and discoloration to the roof deck and associated framing inside the building . . . Moisture staining to wood framing is normally associated with dark discoloration of the wood members. The staining can be single or multiple. Single stains normally exhibit a single circular darkened (very slight) bounded by a line of the extent of the stain. This condition is normally associated with short term and/or single exposures to moisture. Multiple concentric rings of discoloration, with darker staining are often associated with long term or multiple exposures to moisture. The staining of the wood roof framing shows evidence of multiple concentric rings of discoloration which indicates long-term or multiple exposures to moisture.

[*Id*.].

Schoenberger also drew on a technical article aimed at insurance professionals, "Swelling Proof – Evidence for Continuous and Repeated Water Exposure," to conclude that the dark stains on the wood roof framing were at least six- to eight-months-old.[6] As Schoenberger explained:

> According to a study conducted by Ralph E. Moon, Ph.D. and Alicia M. Moon, Esq., wood products exhibit certain changes when exposed to either a continuous or a repeated water event. Some of these changes include discoloration, deterioration, and dimensional changes which can help determine the duration of a water loss. Based on the research:
>
> - Wood will exhibit gradual discoloration and cracking during wet and dry cycle exposure, and will show slight discoloration after two weeks of continuous moisture exposure; and
>
> - Wood discolors slowly and required continuous moisture exposure to develop a dark (two to five months) to black (six to eight months) appearance.
>
> - Accordingly, it is EFI's opinion that all of the water staining is older than six to eight months.

[74-25] 10.

As the EFI Global report confirms, PLM's contention that the water-seepage exclusion applies requires specialized knowledge about how wood changes in response to continuous and/or repeated exposure to water. In the Court's view, the average juror is likely unable to estimate the age of water damage or water staining from the presence of concentric rings of discoloration, and the specific shadings of those rings, as Schoenberger did. Thus, PLM cannot establish that the continuous-or-repeated-seepage exclusion applies without expert testimony. *See Rowsey*, 243 N.E.3d at 1012; *Madsen*, 2022 WL 4483910, at *12. But PLM has not disclosed an expert on this issue. Rather, Schoenberger was disclosed only as a fact witness and a rebuttal witness. Furthermore, Schoenberger's rebuttal report merely criticizes the way the Roofing Engineers conducted their inspection of the roof, *see* [73-14] 1-11, and PLM does not argue that any of Schoenberger's rebuttal opinions would be admissible to establish that the seepage exclusion applies. *Cf. O'Connor v. Ford Motor Co.*, No. 19-cv-5045, 2025 WL 790240, at *14 (N.D. Ill. Mar. 12, 2025) ("The proper function" of a rebuttal report "is to contradict, impeach, or defuse the impact of the evidence offered by an adverse party."); *Africano v. Atrium Med. Corp.*, No. 17 CV

---

[6] This article states that "[d]enying a claim based on the 'constant or repeated seepage exclusion' is controversial because it is difficult to prove." *See* https://www.theclm.org/Magazine/articles/evidence-for-continuous-and-repeated-water-exposure/585 (last accessed Dec. 8, 2025).

7238, 2019 WL 5085338, at *1 (N.D. Ill. Oct. 10, 2019) ("Evidence that is only offered as additional support of a party's argument and that does not contradict any evidence introduced by the opposing party is not proper rebuttal.").

Finally, it is no answer for PLM to argue that a jury could rely on Schoenberger's personal observations of the condition of the roof in deciding whether the exclusion applies. To be sure, Schoenberger could testify, subject to Evidence Rule 701, as to the condition of the roof and even about the staining he observed during his inspection. As discussed above, however, a jury would require expert testimony to understand why and how the dark staining translated into a conclusion that water had been intruding into the warehouse over a period of at least six to eight months.

For all these reasons, 3333 is entitled to summary judgment on Count IV of PLM's second amended complaint to the extent that Count IV alleges that coverage is excluded based on the continuous or repeated seepage of water.

## III.    Occurrence During the Policy Period

Both sides seek summary judgment on Count I of the second amended complaint, which alleges that the loss was not caused by a fortuitous event during the policy period. [69] 10-12; [71] 13-14. The parties agree that, to withstand an insurer's motion for summary judgment on this issue, "the insured must establish a *prima facie* case that: (1) a loss occurred; (2) the loss resulted from a fortuitous event; and (3) the policy was in effect at the time of the loss." *Redmond as Tr. of Merrilee Clark Redmond Trust v. Metro. Cas. Ins. Co.*, Case No. 21-cv-4885, 2024 WL 867071, at *3 (N.D. Ill. Feb. 29, 2024); *see also* [69] 10; [71] 13-14; [78] 11-12.

PLM argues that 3333 cannot establish the second and third elements because the roof had sustained "long term water infiltration" and that any hail or wind damage to the roof "likely . . . occurred over the life of these components and not from one recent event." [69] 11-12. PLM also notes that the Roofing Engineers "did not evaluate or consider whether the alleged [l]oss took place at any other time than June 13, 2022" and even conceded that the loss could have occurred during an August 2021 storm. [*Id.*] 12; [74] 8 at ¶ 54. 3333 responds that its evidence is sufficient to satisfy the second and third elements. [78] 10-11. 3333 stresses that Radzieta never saw water intrude into or pooling inside the warehouse until August 2022, only two months after the June 13 storm. [*Id.*] 12. 3333 also relies on the testimony of PLM's claims manager Nina Manojilovich, which–according to 3333–establishes that PLM acknowledged that a payment was made to 3333 because "the loss was covered." [78] 12. Finally, 3333 argues that expert testimony is required to prove that the loss occurred outside the policy period, but PLM has not disclosed an expert on loss causation. *See* [71] 13-14.

16

Viewed in the light most favorable to 3333, the evidence permits a reasonable jury to find that the loss occurred during the June 2022 storm. Radzieta had never seen water intrude into the building until August 2022. Tishel learned that Radzieta had seen corrugated metal panels on the street adjacent to the warehouse shortly after the storm. In August and September 2022, Bogdan Lassak and Conrad Roofing each observed what appeared to be wind- or wind-borne-debris-related damage to the warehouse's roof. Given this evidence, which the Court accepts as true, PLM is not entitled to summary judgment on Count I. *See Huntington Chase Condo. Ass'n v. Mid-Century Ins. Co.*, 379 F. Supp. 3d 687, 698 (N.D. Ill. 2019) ("Huntington has presented evidence that hail storms took place in May 2014 and that these storms caused damage to the roofs and siding of its buildings. This is sufficient to establish a *prima facie* case on the issue of whether the loss resulted from a fortuitous event.").

The Court also concludes that the evidence viewed in the light most favorable to PLM could support a jury finding that the loss did not occur during the policy period. As PLM argues, a jury could conclude that 3333's determination that the loss occurred during the June 2022 storm rests on "a circular chain of hearsay." [77] 7. No one affiliated with 3333 personally observed damage to the roof in the immediate aftermath of the June 2022 storm. Rather, Radzieta somehow concluded that the June storm had damaged the roof after he noticed water pooling in the warehouse two months later. Radzieta then told Tishel that he believed that the loss had occurred during the June 2022 storm, and Tishel relied on that statement in fixing the date of the loss and submitting the claim to PLM. [84] 1 at ¶ 3. Likewise, the Roofing Engineers also relied on Radzieta's statement about the date of the loss in determining that the June storm caused the loss. [*Id.*] 1-2 at ¶ 4. The Roofing Engineers also conceded that the damage could have been caused by an August 2021 storm, though they thought that was unlikely. [*Id.*] (acknowledging that moisture mapping results during Roofing Engineers inspection "could be" from "that August 2021 storm"). Finally, there was evidence that the roof was in the condition of a 20-year-old-roof, the roof's life expectancy was between 25 and 30 years, and 3333 had made no repairs to the roof between 2014 and 2021. *See* [81] 12 at ¶¶ 15-16; [80] at ¶ 19. For these reasons, 3333 is not entitled to summary judgment on Count I of PLM's second amended complaint.[7]

Finally, the Court rejects 3333's argument that Manojilovich's testimony establishes that PLM acknowledged that the loss was covered. *See* [71] 4; [78] 11. Asked "[i]f PLM had made a payment to an insured, would that be indicative of a coverage determination," Manojilovich responded that the payment "would mean that we paid . . . damage that was caused by covered cause of loss." [73-9] 5, at 12:17-23. This response to a hypothetical question would not compel a jury to find that PLM admitted that the loss was covered. Most importantly, PLM had issued a reservation-

---

[7] To the extent that PLM's argument relies on the presence of water staining indicative of long-term water intrusion, the Court does not consider that evidence given PLM's failure to disclose an expert to opine on this subject.

of-rights letter explaining that it would investigate 3333's claim but was reserving its rights to deny coverage for multiple reasons. The purpose of the reservation-of-rights letter was to inform 3333 that, while PLM would continue to handle the claim, it was not agreeing that the loss was covered. In these circumstances, the fact that PLM made a small payment to 3333 does not equate to a binding admission or even compelling evidence that the loss was covered. *Cf. State Farm Fire & Cas. Co. v. Martinez*, 893 N.E.2d 975, 979 (Ill. App. Ct. 2008) ("An insurer who notifies its insured that it is defending its insured under a reservation of rights and identifies the policy provisions that may preclude coverage is not estopped from subsequently denying coverage.").

## IV.     Exclusion Based on Wear and Tear

3333 purports to seek summary judgment on Count IV of the second amended complaint to the extent that Count alleges that coverage is excluded because the loss is the result of wear and tear. *See* [47] at ¶¶ 65, 68, 71, 83. As relevant here, the policy provides that PLM will not pay for loss or damage caused by wear and tear. *See* [73-2] 74. However, in the section of its motion addressing this claim, 3333 presents no argument about the wear-and-tear exclusion and cites no evidence that would permit a jury to find that the exclusion is inapplicable. *See* [71] 12-13. "A party moving for summary judgment must establish the legal and factual predicates for summary judgment," and 3333's failure to develop an argument and supporting evidence as to why the wear-and-tear exclusion does not apply "operates as a forfeiture, at least for purposes of summary judgment." *Jordan v. Jewel Food Stores, Inc.*, 83 F. Supp. 3d 761, 769 (N.D. Ill. 2015); *see also Grisette v. City of Aurora*, No. 21 CV 4606, 2024 WL 1578901, at *9 (N.D. Ill. Apr. 11, 2024) ("Summary judgment is the put up or shut up moment in a lawsuit, and Grisette's failure to support his claim with adequate evidence or argumentation is fatal at this stage."); *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012) (arguments that are "underdeveloped, conclusory, or unsupported by law" are forfeited at summary judgment). Because 3333 has presented no evidence or argument on this issue, it is not entitled to summary judgment as to the applicability of the wear-and-tear exclusion.

## V.     Exclusions Based on Failure to Mitigate and Neglect of the Insured

3333 seeks summary judgment on Count III of PLM's second amended complaint, which alleges that coverage is excluded because of 3333's failure to take reasonable steps to protect the property from further damage, and on Count IV, which alleges that coverage is excluded based on 3333's neglect to use all reasonable means to preserve the property from further damage. *See* [71] 11-13. The relevant sections of the policy (1) required 3333 to "[t]ake all reasonable steps to protect the Covered Property from further damage" and (2) excluded coverage for damage resulting from the "neglect of [3333] to use all reasonable means to save and preserve the property from further damage at and after the time of loss." [73] 2-3 at ¶ 9; [73-2] 75.

18

3333 argues that it complied with these policy requirements by placing tarps over the damaged areas of the roof. [71] 11, 13. 3333 also contends that PLM has not identified any additional steps that should have been taken to avoid further water intrusions, nor has it offered expert testimony to establish "a standard of care for post-accident preservation efforts." [*Id.*] 13. In response, PLM points to evidence that one of the tarps placed by 3333 eventually became displaced, and that water was still intruding into the building as late as summer 2024. [77] 13, 15.

Viewing the evidence in the light most favorable to PLM, the Court concludes that a material factual dispute exists as to whether 3333 neglected the property or otherwise acted reasonably to avoid additional damage to the roof. It is undisputed that the only step that 3333 took to mitigate further water intrusion was to place tarps over certain parts of the roof. *See* [80] at ¶¶ 36-37. Despite the placement of these tarps, however, it is also undisputed that water continued to intrude into the building. [*Id.*] at ¶ 38. Likewise, EFI Global observed at least one displaced tarp during its May 2023 inspection of the roof. [81-5] 5. A photograph of this displaced tarp also shows a large hole in one of the roof's skylights through which water could easily intrude. *See* [81-5] 28. All this evidence raises a genuine question whether 3333 acted reasonably to protect the warehouse from additional water intrusions after the claimed loss had occurred. Finally, the Court disagrees that expert testimony is required to establish a standard of care for preserving and protecting the property after storm-related damage caused water to enter the building. 3333 cites no authority on this point and has offered only an undeveloped argument, thereby forfeiting the issue at the summary-judgment stage. *See Puffer*, 675 F.3d at 718l; *Jordan*, 83 F. Supp. 3d at 769. In addition, a jury does not need expert testimony to understand that the duty to mitigate might have required 3333 to take additional steps beyond laying tarps over the damaged portions of the roofs, especially when at least one of those tarps became displaced, there was a large hole in a skylight through which water could easily intrude, and it is undisputed that water was observed inside the building on multiple occasions after the tarps were placed on the roof in August or September 2022.

For these reasons, 3333's motion for summary judgment on PLM's failure-to-mitigate defense and the neglect exclusion is denied.

## VI.   Refusal to Provide Coverage Based on 3333's Failure to Cooperate

3333 seeks summary judgment on Count V of PLM's second amended complaint, which alleges that 3333 failed to cooperate in PLM's investigation of the claim. As relevant here, the policy provides that 3333 "must see that the following are done in the event of loss or damage to Covered Property . . . (8) Cooperate with us in the investigation or settlement of the claim." [73] 4-5 at ¶ 9.

"Under Illinois law . . . any condition in the policy requiring cooperation on the part of the insured is one of great importance . . . and its purpose should be observed." *K&S Inv. Prop. Grp., LLC v. Westfield Ins. Co.*, Case No. 20-cv-2426, 2021 WL 148876, at *3 (N.D. Ill. Jan. 15, 2021) (internal quotation marks omitted). "The duty to cooperate recognizes that insurers ordinarily possess little to no knowledge of the facts surrounding a claim, and thus, depend upon their insureds for fair and complete disclosure." *Id.* (internal quotation marks omitted). "To avoid coverage under the policy based upon an insured's failure to cooperate, the insurer must show that: (1) the insured breached the duty to cooperate; and (2) the insurer was substantially prejudiced." *Id.* (internal quotation marks omitted).

"Whether the insured breached the cooperation clause requires the insurer show an exercise of a reasonable degree of diligence in seeking the insured's participation and that the insured's lack of participation represented a willful refusal to cooperate." *Am. Access Cas. Co. v. Alassouli*, 31 N.E.3d 803, 810 (Ill. App. Ct. 2015). "The insurer has to act in good faith to secure the insured's cooperation," *id.*, and "[g]ood faith is evaluated not only in terms of what the insurer did to secure cooperation, but also in terms of what the insured failed to do." *Wallace v. Woolfolk*, 728 N.E.2d 816, 818 (Ill. App. Ct. 2000). "The burden of establishing a breach of the cooperation clause rests on the insurer." *Country Mut. Ins. Co. v. Under Constr. & Remodeling, Inc.*, 196 N.E.3d 590, 599 (Ill. App. Ct. 2021).

3333 argues that PLM's failure-to-cooperate defense rests entirely on PLM's assertion that 3333 ignored PLM's requests for records of repairs that 3333 made to the roof. [71] 11. But 3333 contends that PLM made only one request for these records during its investigation, and that PLM did not make another request for the records until discovery began–and thus long after PLM had denied the claim. [*Id.*]; *see also* [80] 6 at ¶ 21. Finally, 3333 emphasizes that it gave PLM access to its building so that PLM and its agents could inspect the roof. [71] 11.[8] PLM responds that it is undisputed that 3333 never provided the requested repair records, and that these records would have "materially assist[ed] PLM in determining the condition of the roof prior to the June 13, 2022, storm." [77] 12.

---

[8] 3333 also argues that the "mend the hold" doctrine bars PLM from relying on a failure to cooperate because PLM did not raise that defense in its reservation-of-rights letter. *See* [71] 11-12. This doctrine "precludes insurers from denying a claim on one basis and then changing the basis for denial during litigation if there is evidence of unfair surprise or arbitrariness." *Tracy Holdings LLC v. W. Bend Mut. Ins. Co.*, 333 F. Supp. 3d 809, 815 (C.D. Ill. 2018). However, the doctrine "does not bar an insurance company from adding a defense after being sued." *Id.* Here, PLM has not changed the basis of its denial during litigation: it continues to assert that coverage is precluded by 3333's untimely notice while also raising additional grounds for denying coverage (as contemplated by the reservation-of-rights letter). Accordingly, the mend the hold doctrine does not preclude PLM from arguing that 3333's failure to cooperate bars coverage.

Even viewing the evidence in the light most favorable to PLM, the Court concludes that a reasonable jury would have no basis to find that PLM exercised reasonable diligence to secure 3333's cooperation, that 3333 willfully refused to cooperate in PLM's investigation, or that PLM was substantially prejudiced by any failure to cooperate. First, 3333 is correct that PLM's failure-to-cooperate defense rests on a single request for repair records. On August 9, 2023, a senior PLM claims manager, Joe Roche, emailed Tishel and asked him to "forward documentation of the insured's services records and/or repair records." [73-12] 2. It is undisputed that 3333 did not produce any records relating to the roof repairs that were allegedly made in October 2021, *see* [80] 6-7 at ¶¶ 19-20, 22-23, but PLM cites no evidence that would support a finding that 3333 refused to produce the records. Rather, the only evidence cited by either side on this issue establishes that Radzieta undertook a "diligent inquiry" but was "unable to recall or recover the identity of the local roofing company" that made the repairs. [74-10] 2; *see also* [74-3] 24-26 at 23:9-25:2 (Radzieta testifying that repairs were made to roof's sheathing or flashing in October 2021 by "[a] local company" but that he could not find records or invoices related to repair work). Furthermore, PLM cites no evidence that it made any follow-up requests for the records before it denied coverage only a few weeks later. In these circumstances, no reasonable jury could find that PLM was reasonably diligent in seeking 3333's cooperation. *Cf. Alassouli*, 31 N.E.3d at 810-14 (holding that insurer's efforts to locate insured who stopped communicating with insurer after claim was made, which consisted of "calling [insured] five times, leaving detailed messages, conducting a skip trace, and, much later, hiring a private investigator to locate [him]," were "purely cursory" and did not satisfy reasonable-diligence standard).

Second, there is no evidence to support a finding that 3333 willfully refused to cooperate with PLM's investigation of the claim. To the contrary, it is undisputed that 3333 allowed PLM and EFI Global to access the warehouse and inspect the roof. It is also undisputed that Radzieta searched for the repair records but could not locate them or recall the name of the company that performed the repairs. No reasonable juror could find that this amounted to a willful refusal to cooperate. *Cf. Porter v. USAA Cas. Ins. Co.*, No. 22-2510, 2023 WL 3721209, at *2 (7th Cir. May 30, 2023) (applying Illinois law and holding that insured's refusal to sit for requested examination under oath, cutting off communications with insurer, and submitting a cease-and-desist letter to insurer, constituted "a willful refusal to cooperate").

Third, PLM cites no evidence to support its claim that the repair records would have materially aided it in determining the state of the roof before the June 13, 2022, storm. *See* [77] 12.

For these reasons, 3333 is entitled to summary judgment on Count V of PLM's second amended complaint.

## VII.  Section 155 Claim

PLM seeks summary judgment on Count III of 3333's counterclaim, which alleges that PLM's refusal to cover the claim was unreasonable and that its conduct during the investigation was vexatious. *See* [26] 8 at ¶¶ 41-42. In support, PLM contends that, at a bare minimum, there is a bona fide dispute whether it is obligated to cover 3333's claimed loss. [69] 15. 3333 argues that a grant of summary judgment on this claim would be premature because it depends on a resolution of PLM's arguments that PLM owes no coverage under the policy. [78] 14.

Section 155 of the Illinois Insurance Code "allows a court to award reasonable attorneys' fees, plus a penalty, if it finds that an insurance company took an action or delay that was 'vexatious and unreasonable." *Redmond*, 2024 WL 867071, at *5 (quoting 215 ILCS 5/155). "Whether an insurer's actions are vexatious and unreasonable [is] a question of fact, the determination of which is discretionary with the court after it has considered and assessed the totality of the circumstances." *Kohlmeier v. Shelter Ins. Co.*, 525 N.E.2d 94, 105 (Ill. App. Ct. 1988).

The Court agrees with 3333 that PLM's liability for punitive damages under § 155 cannot be resolved on the present summary judgment record. "[T]he Seventh Circuit has confirmed that Section 155 claims remain viable 'in any case in which at least one of three issues remains undecided: (1) the insurer's liability under the policy, (2) the amount of the loss payable under the policy, or (3) whether there was an unreasonable delay in settling a claim." *In re Soc'y Ins. Co. COVID-19 Bus. Interruption Prot. Ins. Litig.*, MDL No. 2964, 2021 WL 2433666, at *5 (N.D. Ill. June 15, 2021) (quoting *Creation Supply, Inc. v. Selective Ins. Co. of the SE*, 995 F.3d 576, 578 (7th Cir. 2021)). As discussed above, multiple factual disputes exist as to whether PLM properly refused to cover the claimed loss, and thus PLM's liability under the policy remains undecided. Accordingly, PLM is not entitled to summary judgment on 3333's request for damages under Section 155 claim. *See also Best v. Owners Ins. Co.*, Case No. 18-1167-MMM-JEW, 2020 WL 4747876, at *4-5 (C.D. Ill. Feb. 25, 2020) (holding that insurer's liability for punitive damages under section 155 was premature where "the parties to this cause have yet to present the facts to a jury"); *Redmond*, 2024 WL 867071, at *6 (court could not resolve § 155 on summary judgment where jury could find that insurer based denial of coverage "on incomplete or speculative information").

## VIII.  Appraisal

Finally, 3333 argues that the Court should enter an order requiring the parties to participate in an appraisal. *See* [71] 4-6. This argument is based on the policy's appraisal clause, which provides that if PLM and 3333 "disagree on the value of the property or the amount of loss, either may make a written demand for an appraisal." [73] 2-3 at ¶ 9. 3333 argues that an appraisal is warranted because the parties

disagree over the amount of the loss. [71] 5. 3333 acknowledges that PLM has disputed its obligation to cover the loss, but 3333 contends that the "'coverage disputes' are, in actuality, disputes about causation and are, therefore, appropriate grounds for an appraisal." [*Id.*]. 3333 also argues that "[t]he policy does not provide an exception to the appraisal provision where there is a coverage dispute," such that an appraisal would be required even if PLM had raised a bona fide coverage dispute. [*Id.*]. PLM responds that an appraisal is not warranted because coverage issues, like those raised in the second amended complaint, are for a court, rather than an appraiser, to address. [77] 5. PLM also raises procedural objections to 3333's request, noting that 3333 has not moved to compel an appraisal or sought summary judgment on its counterclaim alleging that PLM breached the insurance policy. [*Id.*] 6.

"In Illinois, courts treat appraisal clauses as analogous to arbitration clauses, which are valid and enforceable in a court of law." *Mouw v. Shelter Mut. Ins. Co.*, No. 22-CV-2306, 2024 WL 707231, at *2 (N.D. Ill. Feb. 21, 2024) (internal quotation marks omitted). "Illinois courts compel appraisal only when the language of the appraisal clause is clear and unambiguous, and when it is obvious that the disputed issue falls within the scope of the clause." *Id.* (internal quotation marks omitted). "Questions of law, however, fall outside of the appraisal process, which is a relatively limited process with the primary function of ascertaining the value of property or the amount of loss." *Id.* (internal quotation marks omitted).

On the present record, the Court declines to order the parties to participate in an appraisal. The Court finds that granting this relief would be procedurally inappropriate because 3333 has not sought summary judgment on its entitlement to an appraisal or on its claim for breach of contract, nor has it moved to compel an appraisal. *See* [85] (3333 conceding that it "has not moved for summary judgment on its demand for appraisal"). The Court also rejects 3333's argument that there are no bona fide coverage disputes in this case. To the contrary, whether 3333 provided timely notice of the loss is a pure coverage issue that would not be within the scope of any appraisal. *See Zhao v. State Farm Fire & Cas. Co.*, 266 N.E.3d 1229, 1238-39 (Ill. App. Ct. 2025) (holding that timeliness of insured's notice of loss was outside scope of trial court's order compelling appraisal).

**Conclusion**

PLM's motion for summary judgment [68] is denied. 3333's motion for summary judgment [70] is granted as to Count IV of PLM's second amended complaint, but only to the extent that Count alleges that coverage is excluded by the continuous-or-repeated-water-seepage exclusion, and Count V and is otherwise denied. A telephonic status hearing with the Court is set for January 6, 2026 at 9:00 a.m. to discuss how the parties plan to proceed with the case.

**HEATHER K. McSHAIN**
**United States Magistrate Judge**

**DATE: December 17, 2025**